# ERIC CASTANEIRA

oriolesfahn@gmail.com

**SENT VIA EMAIL AND USPS**

August 27, 2018

Circuit Judge Lawrence Piersol
Rm 202 United States Courthouse
400 S. Phillips Avenue
Sioux Falls, SD 57104

Re: Urgent correspondence in CIV. 10 – CV-04039-LLP (Castaneira v. Midland)

Your Honor,

Enclosed is correspondence to Keith Sellen, Director, Wisconsin Office of Lawyer Regulation. It's a response to Mr. Heaton's August 21st reply to my complaint.

Frankly, the desperation Mr. Heaton displays in the reply concerns me. Not only is his reply replete with material misrepresentations, they are easily impeachable. A simple cursory review of the court record was enough to refute most of the claims in his defense.

Not only has Mr. Heaton *not* provided an adequate explanation of his failures to comply with Wisconsin Supreme Court Rules, he's made several material misrepresentations in his reply. The complete investigative process will not be favorable to him.

My take on Mr. Heaton's current approach is that he's placing his own interests before his client's. I may not have much respect for the Defendants' ethics, but I have never questioned their cunning. They must see what I see, too. What dynamic that would allow them to see their current relationship with Mr. Heaton as beneficial (or better than the alternative) is beyond me. Something here is **not** as it is represented or should be.

The original of the letter will be placed in the mail today.

Sincerely,

Eric Castaneira

Cc: Eric Schulte
    Paul Heaton
    Eric Schulte
    Special File D
    Midland National File

EC/ds

# ERIC CASTANEIRA
oriolesfahn@gmail.com

**SENT VIA EMAIL**

August 27, 2018

Mr. Keith Sellen, Director
Office of Lawyer Regulation
110 East Main St., Suite 315
Madison, WI 53703-3383

Re: Clarification regarding my complaint against Paul Heaton

Sir,

After receiving notification that my complaint against attorney Paul Heaton had been prematurely closed I became concerned that the warnings I had provided on July 28th and August 16th regarding improper influence by Mr. Heaton's law firm, Godfrey & Kahn, had been ignored; or worse. My initial impulse was to provide the media with the documentation and narrative for this matter and begin the protest action (discontinuing food, water, and medication for my acute HBP) I had discussed with Ms. Spoke on August 13th in the event there were any "improprieties".

Contemporaneously, I shared the material I submitted to a legal mind I hold in great respect. His opinion was (1) the evidence of Mr. Heaton's actions in CIV. 10 – CV-04039-LLP, Castaneira v. Midland, et al violated Wisconsin Supreme Court Rules on at least three separate occasions; (2) Mr. Heaton made several material misrepresentations and omissions in his August 21st reply; (3) The Wisconsin Office of Lawyer Regulation (WOLR) has an uneven investigative history involving attorneys of prominence and influence[1]; and (4) Director Sellen should be given the opportunity to become directly involved in the investigative process before the matter is referred for public scrutiny.

I agreed.

Before addressing the specific misrepresentations in Mr. Heaton's August 21, 2018 response, I wanted to provide you with some of the context regarding my allegations and Mr. Heaton's defense.

### My 1991 Criminal Conviction

I addressed this in my complaint and supplemental correspondence. It is also addressed in the Chronological Sequence of Events portion of the pleadings I supplied with the original complaint, a portion of which is excerpted here.

> **Summer 1991** – During a deposition Midland National Life Vice President Frederick Wilson[2] threatened Mr. Castaneira and his business partner if they continued the litigation.
>
> **August 1991** – Mr. Castaneira was informed of a telephone call between two individuals

---

[1] Beginning with Calumet County District Attorney Ken Kratz, numerous articles regarding "irregularities" in the WOLR investigative process have been published by various media sources.

[2] Wilson, a former federal agent with the Bureau of Narcotics – the predecessor of the Drug Enforcement Agency – had a history of aggressive behavior and had made a prior telephonic threat to the Plaintiff, informing him directly that the Plaintiff had to "go along to get along, or else".

that he believed to be Frederick Wilson and then president and Midland National Life CEO William Rigsbee in which the subject of harming Mr. Castaneira or his family[3] was raised to prevent Mr. Castaneira from causing any further trouble[4].

**August 1991** – Mr. Castaneira asked an attorney to contact Midland National Life with one last effort to resolve matters in order to avoid having things get out of hand. Midland National Life again agreed to return everything they had taken; however, they refused to consider the objective review and internal investigation.

**September 1991** – Mr. Castaneira drove from his home in Pennsylvania to Midland National Life's headquarters in Sioux Falls, South Dakota with the intention of killing himself inside their building in order to draw attention to Midland National Life's behavior. Mr. Castaneira felt that making the issue public by contacting the media from inside the building would best protect his family.

Mr. Castaneira chose the office of Alan Spencer, Senior Vice President of Sales, because it would allow him the privacy he needed. When Spencer understood why Mr. Castaneira was there, Spencer asked for permission to stay and try to talk Mr. Castaneira out of both discussing the issue with the media and committing suicide[5]. Spencer explained that he didn't want an investigation because he felt he might be charged with a crime[6].

Late in the afternoon Spencer decided to leave his office and did.

After Mr. Castaneira received assurances that his family would be safe he surrendered peacefully and was arrested in the building. Within days he was charged with kidnapping Spencer[7].

Former Governor William Janklow asked Mr. McMahon, a respected local attorney, to represent Mr. Castaneira and Mr. McMahon agreed.

---

[3] This is the audio recording Mr. Castaneira is now offering to the Court.

[4] At the same time, and despite all of Midland National Life's claims of improper behavior by Mr. Castaneira, they offered to reinstate Mr. Castaneira's contract and return all of the commissions they had withheld if he would drop his lawsuit against them. Mr. Castaneira refused to consider this until Midland National Life agreed to objectively review and investigate their sales practices.

[5] Over an eight hour period Mr. Castaneira was able to discuss with the local media and Spencer the events that led him to Midland National Life's building. Spencer apologized for his part in Midland National Life's actions. Spencer felt it was wrong for Midland National Life to attack Mr. Castaneira's integrity because Spencer had always felt Mr. Castaneira was honest and remembered having sent Mr. Castaneira a memo, which Spencer signed, that described Mr. Castaneira as the "most honest man he ever met".

During the time that Spencer spent with Mr. Castaneira Spencer was not restrained or threatened in any way, and allowed to make contact over the telephone whenever Spencer wished.

[6] In the fall of 1991 Spencer was to accompany his family on a trip to Australia. He flew as far as Hawaii and then wanted to return because he claimed to be afraid. He later shared that he was still paranoid about being prosecuted. He also admitted, once under the influence of alcohol, that he had been pressured by Midland National Life, upon threat of his job and pension, to support the company even if it meant lying.

[7] The charges were filed despite being contradicted by Spencer's own candid and recorded statements to the Sioux Falls Police within an hour after Spencer decided to leave his office. Spencer was adamant that he had not been threatened or harmed. Despite extensive prompting by a detective, Spencer could not identify Mr. Castaneira's gun by model or even if it was a revolver or automatic. This tape was not made available to Mr. Castaneira's defense attorney until after the trial phase was over.

After Spencer had the chance to speak with Midland National Life's senior executives and attorneys he began making statements in court and the press that he had been in fear for his life and that he had a gun pointed at his head for eight hours.

        Mr. McMahon attempted to develop and introduce witnesses that would testify that Spencer had a history of lying under oath to protect his employer, Midland National Life; however, Richard Hurd, the trial judge, would not allow that as part of the defense.

        The trial judge made several rulings designed to make it impossible to have a fair trial including denying bail[8] by claiming that Mr. Castaneira was a risk; however, the judge agreed to release Mr. Castaneira, without bail, if Mr. Castaneira agreed to allow the court to enter a guilty plea on his behalf. Mr. Castaneira agreed, in order to see his family, on the condition that Mr. Castaneira would not be required to make a statement swearing that Castaneira had done something he hadn't.

        The trial court found Mr. Castaneira guilty primarily on the basis of Spencer's testimony despite the prosecution having Spencer's taped statement contradicting that testimony.

        Mr. Castaneira was sentenced to 100 years in prison with 30 of those years suspended. At the time it was one of the longest sentences ever for a crime where the victim was not harmed or shots had not been fired.

Mr. Heaton chose to gloss over these events in his reply, including the multiple threats made by his client against my family; and the existence of an audio recording of one of those threats. That recording was offered to the WOLR; however, the investigation was prematurely closed without requesting the recording or addressing Mr. Heaton's failure to disclose the court record that the threats were the ***singular cause*** for my actions.

Mr. Heaton also chose to gloss over the fact that the governor of South Dakota issued one of the few significant commutations of a sentence for a violent crime during the sixteen years he was in office. Nor did he mention that Jeremiah "Jere" Murphy, the former head of the South Dakota Parole Board, represented me *pro bono* in my parole process until my sentence was commuted to time served[9] once the Parole Board became aware[10] of the facts regarding the actions Mr. Heaton's client, Midland National Life, had withheld from them and/or misrepresented.

In South Dakota this is often the method of correcting miscarriages of justice.

Mr. Heaton further failed to disclose that the 2003 settlement, which his client breached causing the litigation in which he committed the acts detailed in my complaint, was intended to redress his client's previous actions[11]; and hide those actions behind a non-disclosure agreement.

---

[8] Before the trial court made its bail decision, it required Spencer to be examined by Dr. David Bean, a local psychiatrist who had a long history of working with law enforcement. Bean's report to the Court indicated that Spencer was in great fear of Mr. Castaneira; however, Bean chose not to explore whether that fear might be that Spencer's false sworn statements would be discovered.

Spencer had a drinking problem that caused him to make statements and admissions on occasion that he would later regret, and admitted to an acquaintance that he had been afraid of being prosecuted for his part in covering up the improper sale of life insurance policies and his perjury in Mr. Castaneira's hearings.

[9] The settlement had a silent codicil which Midland National Life did not want documented in any form.

Midland National Life agreed to advocate for my ability to relocate outside of South Dakota and pay me approximately $75,000 to facilitate that move. That process eventually included their public support for the commutation of my sentence. They bungled the process and refused to work with me on an acceptable alternate solution while awaiting the next Board hearing. That constituted the agreement breach.

[10] That knowledge developed from the allegations contained with the civil action addressed in the complaint now before the WOLR. Midland National Life chose not to deny those allegations and the Board voted unanimously to commute the remainder of my sentence.

[11] That included, among other acts, withholding over $50,000 from me while I was incarcerated. That money would have gone to support my two young children, both of which suffered from birth defects.

### Mr. Heaton's Ill Advised Comments and Assurances to His Clients Regarding the Complaint Filed Against Him with the WOLR

Mr. Heaton appears to take issue with my communications with his clients. His indignation is unjustified.

His clients have every right to make an informed decision regarding whom they chose to represent them. They also have the right to know if the results developed from that representation could become "unsettled" in the future.

I was candid with the WOLR about my contacts in my July 28th correspondence.

> "On July 20, 2018 Mr. Heaton filed another Objection with the Court taking a derisive tone regarding the complaint before you[20]."

> [20] Mr. Heaton is, apparently, taking this attitude outside of court; too. I have had extensive communications with some of Mr. Heaton's clients, and certain of those clients' employees over the past few weeks. The impression Mr. Heaton may be trying to portray is that his clients should not be concerned about the complaint because it is without merit and Godfrey & Kahn will quickly quash the matter.

I experienced a great deal of cooperation from those contacts, which allowed me to raise the concern that Mr. Heaton had openly discussed his firm, Godfrey & Kahn, applying undue influence on the WOLR to quash any investigation before formal examinations could begin.

Mr. Heaton admits to being aware of those contacts yet made no effort to stop them. His previous position in court has been that I'm an extortionist, so gaining relief should be a simple matter. Of course, that would require testifying under oath about their previous actions. The record is clear they are loathe to do that, which may be why he or the firm have not sought an injunction to silence me[12].

Mr. Heaton then materially misrepresents the Court's August 14, 2018 and August 21, 2018 Orders.

> "Similarly, within days of the issuance of the court's August 14, 2018 decision, Castaneira filed a pleading asserting that "Paul Heaton is now under investigation by the Wisconsin Office of Lawyer Regulation" and demanding Heaton's disqualification as counsel for failing to notify the federal court of this "investigation." See Exhibit 4 (8/14/2018 filing without enclosures). As you know, of course, the rules draw a clear distinction between "intake" review (SCR 2202) and "investigations" of complaints (SCR 22.03). Investigations are commenced only if there are sufficient facts to do 50. Sec SCR 22.02(6)(c).

---

In 1997 the IRS filed a tax lien against me for income on commissions I was supposed to be receiving from Midland National Life; however, I had not received a check from them in over seven years nor had they sent me a 1099. As such, I had not filed a return reporting the income. Penalties accrued, and the IRS levied Midland National Life because Midland National Life had been filing 1099s in my name to launder the money off of their books.

An attorney contacted Midland on my behalf for an explanation and Midland National Life, an insurance company required by law to know where every dollar is at every moment, took 42 days to respond that they had over $50,000 in commissions they had been holding for me *without* my permission. Midland National Life also could not explain why they had been served an IRS lien on any money due me in their possession over one year earlier, but had not disclosed the money to the IRS in violation of the law.

[12] Such action would have required the participation of every client I communicated with and placed the concerns they expressed to me on the record.

> In any event, Castaneira himself had already advised Judge Piersol of his filing of the Wisconsin OLR complaint, obviating any need for further "disclosure" by me concerning his filing of a grievance. Castaneira nonetheless renewed his request for a hearing on my potential disqualification as counsel for Midland based on my purported failure to disclose the OLR "investigation," which request Judge Piersol already has denied in an order issued earlier today."

Mr. Heaton appears to show great concern that the Court is incapable of understanding the relevant Wisconsin statutes. This, even though I footnoted a reference for the Court in the pleadings Mr. Heaton is so indignant about.

Then Mr. Heaton conveniently ignores the fact that I had not received the Court's August 14th Order when I filed the pleadings which so offend him[13]. Regardless, Mr. Heaton was aware of the facts from my August 16th letter to the Court.

> "Enclosed is correspondence to Kathryn Galarowicz, Intake Investigator, Wisconsin Office of Lawyer Regulation. The contents speak for themselves.
>
> *I became aware of this information over the weekend and had hoped to have something substantial to include in the Amended Motion I was constructing at the time. Facing a mail deadline yesterday I decide to file the motion to inform the Court of what I was confident about at that point. Between then and now I have learned enough to feel confident that the information I have received regarding Mr. Heaton is accurate.*" (emphasis added)

Once the Court became aware of the facts it issued a subsequent Order with the following language.

> "Among other things the Plaintiff requested was that, in the alternative, the Court inform the parties that an evidentiary hearing be held should the Wisconsin Office of Lawyer Regulation determine the Plaintiff's complaint against Attorney Heaton is founded and sanctions are imposed. If such a determination is made by the Wisconsin Office of Lawyer Regulation, the Court will then consider holding an evidentiary hearing on issues to then be determined by the Court.
>
> The Court also is entering this Order so that neither party assumes that the Court's August 14, 2018 Order, Doc. 171, precludes any consideration by the Court of an adverse action that the Wisconsin Office of Lawyer Regulation might take. Defendants and their counsel are not requested at this time to make any response to Plaintiff's latest Supplemental Motion, Doc. 172, and the Brief in Support, but if they wish to do so, they may within twenty (20) days from the date of this Order."

It's clear the Court intends to take notice of a properly completed review by the WOLR.

### Extra Legal Efforts to Corrupt the WOLR's Investigation

In his effort to marginalize his actions Mr. Heaton then obliquely admits to some form of effort to exert improper influence on "former colleagues from Godfrey & Khan who have ascended to the federal bench in Wisconsin" while making material misrepresentations to the WOLR.

> "*In his August 16th letter Castaneira darkly implies that my former colleagues from Godfrey & Khan who have ascended to the federal bench in Wisconsin have facilitated my alleged ex parte efforts to influence Judge Piersol's decision in the pending South*

---

[13] Mr. Heaton benefits from electronic filings and access to PACER. I don't.

> ***Dakota action***. Castaneira obliquely claims in his August 16th correspondence that he has "been informed" by anonymous but "unimpeachable" sources that Heaton had "discussed back channel influence upon the judge in the underlying case (Lawrence Piersol)." Castaneira forwarded a copy of this missive to Judge Piersol, who is in a fairly good position to evaluate the accuracy and sincerity of Castaneira's latest slander[14]." (my emphasis)

Mr. Heaton is referring to my August 16th correspondence to Ms. Galarowicz.

> "After speaking with you this past Monday I was provided additional information regarding potential inappropriate interference in the current complaint regarding Mr. Heaton. This information seems to validate the concerns I raised in my July 28th correspondence.
>
> I mentioned that many state and federal judges have ascended to the bench from Godfrey & Kahn. That fraternity provides the opportunity to communicate and influence matters in a manner that would ***not*** become part of any official record.
>
> I have been informed that Mr. Heaton has discussed back channel influence upon the judge in the underlying case (Lawrence Piersol) by Godfrey & Kahn. ***If*** true, this is a very serious matter. The implications extend far beyond the OLR and would require referral to the Department of Justice."

My correspondence does not mention anyone specifically other than Judge Piersol and expresses doubt that he had been influenced based upon his previous rulings[15]. ***Mr. Heaton*** specifies judges appointed to the federal bench in Wisconsin.

After reading the paragraph in question several times I find it interesting that ***Mr. Heaton <u>never</u> denies having attempting to exert influence on Judge Piersol through the judges he refers to***, or even discussing whether he had done so[16].

Mr. Heaton should be given the opportunity to deny, under oath, that he had any form of conversation regarding adulterating the process for this complaint and then see if any credible evidence impeaching that declaration enters the public domain.

### The Extortion Issue

For an educated man Mr. Heaton seems to have a difficult time comprehending the English language. Despite the overwhelming evidence to the contrary, he persists in materially misrepresenting the settlement offer[17] I made at Mr. Schulte's request. Something Mr. Heaton

---

[14] As a lay person even I know what Mr. Heaton is alleging in his diatribe would constitute ***libel***, not slander.

[15] "I have several motions before this judge that he has yet to rule upon. I want to believe he is beyond any *ex parte* communication or influence on this matter. His rulings to this point have generally been even handed, although I have disputed those which I recognized were colored by the pervasive fraud detailed in my complaint against Mr. Heaton."

[16] Apropos of nothing else, Mr. Heaton is almost certainly aware that in today's world ***any*** electronic device that contains a micro phone is capable of being activated which allows the recording of whatever it hears. Cell phones, office phones, conference phones, blue tooth devices, televisions, computers, and tablets are all vulnerable.

[17] Mr. Heaton also seems to have difficulty with math. My offer was for his client to honor the $75,000 they had contractually committed to and purchase my $250,000 life insurance policy issued by his client at face value, which is ***not*** uncommon for a person my age.

I also asked his client to extend me a short-term mortgage to accelerate my relocation ***as <u>they</u> had requested***. His client had insisted on having some ongoing leverage on me and I felt that their ability to

admits to having discussed with him.

The entire issue of whether the settlement offer Mr. Schulte solicited from me[18] in our August 5, 2010 telephone conversation turns on whether Mr. Schulte had informed James McMahon previously that Messrs. Schulte and Heaton's client, Midland National Life, considered such a settlement to be part of a *quid pro quo*. The evidence clearly evinces they did.

Mr. Heaton is aware of this as he admits to having discussed the matter with Mr. Schulte[19].

> "Eric Schulte no doubt told me about Castaneira's August 5, 2010 phone call to him prior to the September 7, 2010 hearing, probably within days or hours of the call."

The only question is exactly what Mr. Schulte told him about Mr. Schulte's conversations with Mr. McMahon. Mr. McMahon made his position clear in his October 27, 2014 letter to Mr. Schulte. Mr. McMahon is prepared to testify to the WOLR about his conversations with Mr. Schulte. Mr. Schulte can be compelled to testify what he discussed with Mr. Heaton unless Mr. Schulte asserts his Fifth Amendment rights citing an ongoing criminal conspiracy.

That letter became available to Mr. Heaton no later than December 2014. Mr. Heaton never tried to contact Mr. McMahon to discuss critical facts which were not barred by privilege and which would determine whether Mr. Heaton was required to make a correction to the Court. Yet Mr. Heaton makes unambiguous assertions to the WOLR that he has acted properly despite admitting he failed to do his due diligence regarding the material representations he made to the Court.

Even when Mr. Heaton had the opportunity to listen to the call he failed to take the corrective measures which he was obligated. "However, I did not have the benefit of the audio recording of the conversation until several years later, when Castaneira first submitted the audio recording to the Court."

In the next paragraph Mr. Heaton makes another material misrepresentation.

> "When I had the opportunity to listen to the recording of the conversation years later, I concluded - as did Judge Piersol - that it had no bearing on the extortionate nature of the $547,000 demand or the extortionate character of Castaneira's other, similar conduct occurring before, during, and after the transmittal of that $547,000 demand. By that time, of course, Judge Piersol already had been supplied with the recording, enabling him to form his own conclusions."

Judge Piersol has *never* had the opportunity to rule on the recording as evidence as there has never been an evidentiary hearing in which it would be addressed. Mr. Heaton has made continuing material misrepresentations to the Court to avoid just such a hearing.

---

control my mortgage and the equity I was placing in the home from what they had previously agreed to pay me would satisfy what I saw as an unnecessary condition on their part. These items had been agreed to by his client's prior counsel.

Mr. Heaton, Mr. Schulte, and Midland National Life *never* intended to act in good faith. **Within hours** of receiving the settlement offer they had solicited from me they admit they filed pleadings in Court alleging extortion. Those pleadings were replete with material misrepresentations. They never replied with a counter offer or a request for a clarification of my offer.

[18] Mr. Heaton conveniently ignores the fact that this settlement offer was based upon discussions I had with Mr. Schulte's predecessor over a four month period.

[19] Mr. Heaton admits to discussing August 5th call with Mr. Schulte, but does not provide any specifics of the conversation. Why? The contents of the call with me weren't privileged. Was Mr. Heaton's cursory admission a slight of hand to avoid the WOLR examining Mr. Schulte about the specifics of that conversation?

Judge Piersol has consistently ruled that I haven't presented enough evidence to have that hearing. He has not indicated what he considers enough evidence, which explains why I have made continuing motions. Apparently, having a third-party investigative body like the WOLR render an adverse decision on Mr. Heaton's actions may be enough according to the Court's August 21st Order.

Mr. Heaton then makes another material misrepresentation.

> "While Mr. Schulte did respond to Castaneira's phone call and opening comment by asking him how he proposed to resolve the lawsuit, Mr. Schulte did not initiate the call or the subject of settlement."

A cursory review of the first seven minutes of the August 5, 2010 audio recording of the telephone call between Mr. Schulte and me will show that at just after the seven minute mark Mr. Schulte was the first party to raise the issue of settlement - "Do you have a message you'd like me to send back or a settlement offer or a proposal offer of anything you'd like me to pass on". This is exactly what McMahon found in his review of the recording and informed Schulte of the same in the October 27, 2014 letter.

Mr. Heaton admits to having heard the recording. How can he make such a gross material misrepresentation of the facts? Is he simply contemptuous of the WOLR or the investigative process? Does he believe Godfrey & Kahn will exert inappropriate influence so the facts will be ignored?

How could such an easily verifiable fact have gotten by the intake investigator, Ms. Galarowicz?

Mr. Heaton then dissembles about the August 5th phone call. He claims the call was disclosed to the Court. That's true; however, the call was materially misrepresented in its nature. Mr. Heaton never disclosed that Mr. Schulte solicited a settlement offer from me several times.

The Court treated the September 7, 2010 hearing as if it were *ex parte*. If Mr. Heaton would have been candid about the contents of the August 5, 2010 telephone call with the Court as required by the Supreme Court Rules regarding *ex parte* hearings, he would not be facing his current jeopardy.

Mr. Heaton then makes another material misrepresentation regarding the Court's rationale in granting Mr. Heaton's client an injunction. Mr. Heaton claims the Court viewed my communication with Midland National Life's agents as extortionate; however, the record is clear that the Court premised the entire extortion issue on Mr. Heaton's material misrepresentations regarding his client's *quid pro quo* nature of their settlement offer solicitation.

### The Randy Beal Issue

Mr. Heaton's efforts to justify his behavior in this matter would be laughable if the matter wasn't so serious.

Mr. Heaton asserts,

> "Mr. Beal is a respected professional who submitted his sworn account to the Court and who had no incentive to misrepresent himself. Conversely, Castaneira is a serial liar who routinely engages in deceptions without provocation or restraint."

As described in my July 28th correspondence to Ms. Galarowicz,

"Regardless, the affidavit sworn to by Mr. Beal was demonstrably false. A cursory review by Mr. Heaton should have raised valid concerns. (1) Mr. Beal claims his encounter was at "7:10 PM" on June 11, 2013. At latitude 43.495818 and longitude -96.783549 the sun would not have set for more than two hours; (2) the ambient light would have allowed Mr. Beal to take a picture with his cell phone of the car he claimed he saw[20]. He didn't; (3) the same ambient light would have allowed the multitude of security cameras on and around the Midland National Life building to capture an image of the suspect vehicle[21]. They didn't.

Mr. Heaton chose not to inform the Court that I had advised him, as an act of good faith, in prior correspondence that I would return to Sioux Falls from an undisclosed location (Florida) to assist my girlfriend, Lisa Ellefson, in recovering from surgery[22]. Midland National Life used this information to increase the surveillance they had been conducting on Miss Ellefson[23].

Assuming Mr. Heaton took Mr. Beal's testimony, Mr. Heaton should have seen red flags immediately. Mr. Beal supposedly encountered the suspect vehicle in broad daylight but did not secure a picture. Midland National Life could not produce one picture from any of its security cameras positioned around the building despite having an unobstructed wide-angle view of the street Mr. Beal claimed he witnessed the vehicle[24].

In the same filing Mr. Heaton took testimony from Midland National Life executive Robert TeKolste[25] that Midland National Life reported the alleged "drive by" to law enforcement. Mr. Heaton represented "The company immediately reported Castaneira's activities to local law enforcement." to the Court in August 14, 2013 filing[26]; however, he didn't submit a copy of the police report. This makes it reasonable to assume Mr. Heaton never saw the same.

At that point the *only* foundation for the testimony of Mr. Beal that Mr. Heaton submitted to the Court was Mr. Beal's signature on the affidavit. Mr. Heaton knew, or should have

---

[20] In Mr, Beal's affidavit he claims he saw the car's license plate as 1PA 731. Mr. Beal never explained how he was able see the license plate but couldn't secure a picture of the car with his phone.

[21] A copy of a satellite photo of the MNL building is included as Exhibit# 05. It shows that there are no obstructions between the building and the street Mr. Beal claims to have seen the suspect vehicle driving on for over 180 degrees of arc.

[22] I made this disclosure in good faith in the event Midland National Life was interested in working with me on a resolution.

[23] A byproduct of the surveillance was obtaining the license plate number of *Ms. Ellefson's* Blue 2005 Honda Accord.

This was not a simple matter. Ms. Ellefson kept the vehicle garaged except when she drove it. To obtain her license plate number someone would have had to follow her after she exited the garage.

Then there is the issue of verifying that the vehicle was hers. In South Dakota, the Division of Motor Vehicles may not disclose the owner of a vehicle without a court order except to law enforcement involved in a legitimate investigation. Law enforcement may not obtain or disclose the owner of a motor vehicle to a non-law enforcement person.

Yet, Mr. Beal testified "…the license plate of their car 1 PA 731 which is the license plate number we had on file for Mr. Castaneira". Regardless whether Mr. Heaton had good cause to accept Mr. Beal's testimony at face value, he submitted to the Court evidence *he knew, or should have known, was obtained through a criminal act*.

[24] See Exhibit# 05 – Map of Midland National Life Building. This is a Google Map Satellite view of the Building and surrounding area. It evinces that almost every camera affixed to the west side of the building and parking lot should have had a clear view of the suspect vehicle and Mr. Beal.

[25] Exhibit# 06

[26] Exhibit# 07a

> known, that Mr. Beal had a very strong motive to say whatever he thought Midland National Life wanted to hear.
>
> Mr. Beal ran a very small security company whose largest contract was Midland National Life. Mr. Beal had been informed by Midland National Life that I would be in Sioux Falls beginning in late April. It was now mid-June and Mr. Beal had been driving uneventful circles around the Midland National Life building for weeks. He must have begun to wonder whether Midland National Life would continue to see a need for his services.
>
> Suddenly, a sighting; *in broad daylight*. Mr. Beal is a hero! The only problem is there is no supporting evidence.
>
> Mr. Heaton, an experienced trial lawyer who must have examined scores of witnesses, seems to be absolutely satisfied with what should have been alarming inconsistencies."

Mr. Beal had *every* incentive to lie. He ran a very modest company that depended on Midland National Life's business to keep the doors open. This is evidenced by the fact that Mr. Beal, *himself*, was on patrol after normal business hours instead of an employee[27].

As described, above, **Mr. Beal did not have <u>one</u> piece of tangible evidence to support his claim** that he saw me on June 11th. Until further facts are developed I won't take issue with Mr. Heaton's willingness to accept Mr. Beal's uncorroborated testimony; **however, I <u>do</u> take issue** with Mr. Heaton's failure to properly investigate Mr. Beal's story once he was presented overwhelming evidence that Mr. Beal could not have seen what, when, or where he said.

Mr. Heaton's glowing endorsement of Mr. Beal's integrity ignores that Mr. Beal testified he was in possession of private and privileged information about Ms. Ellefson which could only have been obtained by stalking her or corrupting a state employee or law enforcement officer.

Mr. Heaton was informed on August 15, 2013 by my affidavit that Mr. Beal's testimony was suspect. Mr. Heaton may claim that I am "a serial liar"; however, he has accepted, *without exception*, every word I have testified to when it suited his needs. The record reflects that *in eight years of litigation Mr. Heaton has yet to produce <u>one</u> shred of unimpeachable evidence, or otherwise demonstrate, that I have made a misrepresentation in <u>any</u> pleading I have filed with the Court or tribunal*. The record further reflects that Mr. Heaton has aggressive opposed any proceeding that would allow him the opportunity to impeach my credibility *under oath*.

Mr. Heaton apparently believes Mr. McMahon is a liar, too. Mr. McMahon was very clear in his October 27, 2014 letter he was confident that I had proven to him I was in Florida when Mr. Beal claimed he saw me, and that he could prove the same to the Court. That fact alone should have given Mr. Heaton good cause to interview Mr. Beal again.

Mr. McMahon offered convincing evidence, and access to the same, to Mr. Schulte. I offered the same to Messrs. Schulte and Heaton. They have ignored those offers, yet Mr. Heaton materially misrepresents those facts.

> "If Castaneira had been in Florida on June 11, 2013, he would have submitted travel records, flight records, phone records, and credit card records demonstrating his whereabouts a long time ago. Even now - in his complaint to the Wisconsin OLR – Castaneira has failed to present any such evidence. Castaneira was precisely where Mr. Beale said Castaneira was that day – driving by the same Midland headquarters where he

---

[27] Of course, Mr. Beal's presence is more logically explained if he *intended* to be in that very spot at that very time. One can come to their own conclusions as to his motives *if* that were true.

had held the Midland executives hostage years before[28]."

I have alleged that Mr. Heaton has made numerous material misrepresentations to the Court and the WOLR. It's reasonable to equate a material misrepresentation with a lie. Mr. Heaton's August 21st reply to the WOLR is replete with demonstrable material misrepresentations. Merriam Webster defines a liar as "a person who tells lies", and serial as "performing a series of similar acts over a period of time".

I'll leave it for others to decide who is the serial liar.

### The 1991 Audio Recording of Midland National Life Threatening My Family

Mr. Heaton has described the 1991 audio recording of then Midland National Life CEO William Rigsbee and then Midland National Life Vice President Frederik Wilson conspiring to commit violent criminal acts against me and my family as "purported" and "fictitious" in various parts of his August 21st reply.

The recording consists of a conversation between the parties discussing options to dissuade or silence me in 1991 when I was reporting Midland National Life's unethical and illegal business practices to the relevant state regulatory agencies.

Mr. Heaton derisively disparages the recording despite his client's several opportunities to obtain a copy for their personal evaluation. Mr. Schulte examined me at length regarding the recording in the August 5th telephone call which Mr. Heaton admits he discussed with Mr. Schulte. Mr. Schulte almost certainly obtained details about the call from Jere Murphy, who discussed (and may have played the recording for him) it with him prior to that call[29].

The first was in conjunction with the settlement offer Mr. Schulte solicited from me. He established a condition that I provide him with a copy. I agreed on the condition that his client, Midland National Life, have it independently evaluated; and the parties mutually release it to the public with the findings of their evaluation. Midland National Life declined that offer.

The next was my offer to submit the recording to the Court as evidence on the condition that Midland National Life agree to a hearing and not seek prosecution of any party who had been in possession of it during the applicable statute of limitations *except* me. The audio recording had never been germane to the 2010 litigation. Consequently, it has never been introduced. Midland National Life declined that offer.

I offered the recording to Ms. Galarowicz in my July 28th correspondence,

> "If you believe you will need a copy of that recording to conduct your inquiry, please

---

[28] This single paragraph evinced Mr. Heaton's complete disregard for accuracy in his representations and his lack of due diligence in verifying the facts. First, I was not charged with holding "Midland *executives* hostage" I was charged with holding one hostage; and he later recanted his testimony close to his death. Second, the Midland National Life building Mr. Beal claims he saw me at is not the same building the company occupied in 1991. These are simple facts that anyone with an internet search engine would be able to confirm.

[29] When questioned by the Court about his knowledge of the recording during the September 7, 2010 hearing Mr. Heaton claimed the facts were not available to him. This despite Mr. Heaton admitting he has discussed the August 5th telephone call with Mr. Schulte.

Furthermore, the transcript shows Mr. Heaton informed the Court that the two parties involved in the call, Rigsbee and Wilson, were still alive on that date; however, Mr. Heaton failed to provide the Court with a declaration by either of the participants about the call. If either disputed the call took place this would have been the *perfect* opportunity to submit that testimony. One can come to their own determination why either man was willing to make such a sworn statement.

explain why and I will work with the parties holding it to allow you access."

She has yet to request it on behalf of the WOLR.

Mr. Heaton's several adamant denials that the recording exists virtually compels the WOLR to request it as evidence. Because of the legality involved in chain of ownership, the recording will have to be released into the public domain to provide it to the WOLR. Mr. Heaton's material misrepresentations about the recording will now cause it to be labeled as the chilling evidence the WOLR inexplicably declined to include in the record, or the chilling evidence the WOLR has included in the record to support its finding that Mr. Heaton materially misrepresented the facts in his reply[30].

**Mr. Heaton Has Yet to be Confronted by the Allegations I Have Made Against Him**

The tenor of the questions asked by Ms. Galarowicz fail to require Mr. Heaton to explain the facts I have presented, or his actions in question.

> Question 1(a) is "Do you believe that you misrepresented anything to the court in describing Castaneira's August 23 emails as extortionate?"

Asking Mr. Heaton if he committed an act that could result in the revocation of his law license is absurd on its face. A more effective question would be - Explain why you believe your representation to the court that Castaneira's August 23rd email was extortionate.

> Question 1(c) is "Do you believe that you were under any obligation to disclose the August 5, 2010 conversation to the court? Please explain."

A more effective question would be - Explain why you believe you were *not* under an obligation to disclose the August 5, 2010 conversation to the court?

These two examples are indicative of the overtly sympathetic tone of the questions put to Mr. Heaton. One could easily get the impression the WOLR was more interested in protecting a partner from an influential law firm than objectively and equitably policing the ethics of attorneys licensed to practice in Wisconsin.

### Midland National Life

Despite Mr. Heaton's many efforts to paint the client who is paying him a substantial amount of money as "the innocent victim" in this matter, Midland National Life has a colorfully sordid history of abusing their policy holders (particularly vulnerable senior citizens), their policy beneficiaries (recently widowed parental survivors and their children), their employees, and their agents.

Simply Google "Midland National Life lawsuits" and review the first three or four pages of results. Consumer fraud, unethical sales practices, Attorney General actions, regulatory penalties, class actions lawsuits resulting in around $100,000,000 in settlements, Social Security Death List fraud, and too many consumer complaints to count.

The work place environment has been described by many current and former employees as a time bomb ready to go off. Those employees who question Midland National Life's suspect business practices are often terminated with little or no compensation and coerced into signing non-disclosure agreements to coverup the issue that cost them their job.

---

[30] Mr. Heaton may also earn the distinction of the attorney single handedly responsible for causing a world class public relations nightmare for his client to protect his reputation and obstruct justice. I wonder if he'll proudly post *that* on his personal web page on Godfrey & Kahn's website.

Midland National Life's sales agents that report their concerns to regulatory agencies are threatened and denied the commissions they earned over years of hard work.

Midland National Life has been accused again and again of RICO (Racketeer Influenced and Corrupt Organizations) violations in its business practices. One can come to their own conclusion whether Midland National Life is a corrupt organization.

## Conclusion

It's inexplicable that the WOLR would have accepted Mr. Heaton's response at face value and made a decision based on it without allowing me to impeach its contents. Perhaps the workload at the WOLR caused an oversight.

Mr. Heaton's serial efforts to avoid explaining his actions to any form of tribunal has resulted in his continuing material misrepresentations to the Court and, now, to the WOLR.

Mr. Heaton's arguments are circular. I allege he committed fraud on the Court by making gross material misrepresentations alleging extortion. The Court accepted that *ex parte* argument because acts committed by his client Midland National Life prevented me from attending the hearing in which Mr. Heaton committed fraud. Mr. Heaton vehemently denies[31] defrauding the Court. Yet; he and his client have abandoned enforcing the injunction gained by that fraud, offered me what they value at over $1,000,000 to end the matter, and have aggressively contested holding any hearing in this matter which would require them to explain their actions to the Court.

In effect, Mr. Heaton argues that he has committed fraud so effectively and on such a broad scale that he is above being held responsible for his actions. Besides, he's a partner (shareholder) in Godfrey & Kahn; which means the rules don't apply to him[32].

Somewhere in the process it seems to have been lost that requiring Mr. Heaton to make the correction warranted in this matter makes his entire argument moot. His defense of extortion and disparagement evaporates once he is held accountable for fraud on the Court.

Accepting, for the sake of argument, Mr. Heaton's diatribe regarding my character and the credibility of my allegations; it would appear that his client, Midland National Life, would have a slam dunk case to enjoin me from libeling or disparaging them any further. The injunction Mr. Heaton obtained through fraud for Midland National Life allows them to circumvent the lengthy due process requirements if they were willing to return to court and enforce it. But, they won't because they would then be compelled to testify, under oath, for the first time about the actions Mr. Heaton committed to obtain that injunction.

If someone was looking for a one step method to determine which party has credibility in this matter, that should be it.

Just like in previous cases the WOLR has given second consideration, the facts and Mr. Heaton's guilt in this matter are so clear that a lay person would recognize it when it's explained by the media.

It appears that Mr. Heaton desires to share the burden of his actions with his clients and the members of the Wisconsin Assembly and Senate. I have had communications with many of those parties. They are concerned that this matter will become public and they will be associated with Midland National Life's action through their association with Mr. Heaton and Godfrey & Kahn.

---

[31] ...but, very carefully, not under oath.
[32] My correspondence with the WOLR detailed Mr. Heaton's assurances of the same to his clients.

No reasonable person or business entity would want to be associated with violence against women, fraud, perjury, and an audio recording of threats against my family. In exchange for their assistance I promised to provide those parties the WOLR's decision in this matter once I receive it. If the premature termination of the investigation into Mr. Heaton is the WOLR's final word on the matter the resulting public scrutiny will be those parties to bear.

I am not looking to end Mr. Heaton's legal career. I made it very clear to Ms. Galarowicz,

> "Be advised that I consider a reasonable resolution of this matter to be an accurate, comprehensive, and detailed correction by Mr. Heaton to the Court. If Mr. Heaton were to reevaluate the filings and refer them to a "Red Team" or "Tiger Team" ***within or without his firm***, (Godfrey & Kahn) for review he might receive guidance suggesting such a correction is appropriate. Meeting his obligation to the Court would render this complaint moot from my perspective, and I would see no reason to pursue it further."

I would note that virtually every fact included here has been in the possession of the WOLR as part of the original complaint and the supplemental information requested and provided.

For the facts listed above, I believe it's in the interest of justice and the integrity of the Wisconsin legal profession that a comprehensive review of Mr. Heaton's actions in this matter be undertaken.

I have clearly detailed the threats and violence previously directed by Midland National Life against my family in my collective correspondence. The desperation Mr. Heaton has displayed in his August 21st reply has enhanced my concern. At least twice before Midland National Life has evinced such desperation. The first time resulted in the 1991 audio recording and the second in Midland National Life placing armed thugs outside Ms. Ellefson's home.

As such, I would ask the WOLR to expedite the investigative process to reduce my family's exposure to the briefest period possible.

Sincerely,

Eric Castaneira

CC: Paul Heaton OLR File
    Paul Heaton
    Eric Schulte
    Special File D

EC/ds